UNION NAT. BANK (PURVIANCE v.). See Case No. 11,475.

UNION NAT. BANK v. THIRD NAT. BANK. See Case No. 4,801.

UNION NAT. BANK (UNITED STATES v.). See Cases Nos. 16.596 and 16,597.

UNION NAT. BANK (WILDER v.). See Case No. 17,651.

---

## Case No. 14,376.

### In re UNION PAC. R. CO.

[10 N. B. R. 178; 6 Chi. Leg. News. 355; 8 Am. Law Rev. 779; 31 Leg. Int. 261.] [1]

District Court, D. Massachusetts. 1874.

BANKRUPTCY — RAILROAD COMPANY—MORTGAGE— "TRADER"—ACT OF BANKRUPTCY.

1. It is not an act of bankruptcy for a railroad corporation to convey its property in trust to secure bonds to be issued and sold, and the proceeds to be applied to pay all its unsecured debts; the same being done bona fide with a view to enable the company to continue its legitimate business, though it may be technically insolvent, or likely soon to be so.

2. Such a mortgage is not made invalid by the circumstance that the unsecured creditors are offered the right to take the new bonds, or the proceeds of sale thereof, at their election.

3. It seems that a mortgage for money to pay debts ratably would not be an act of bankruptcy even in a trader.

4. Some distinctions between traders and railroad corporations, in respect to mortgaging. their property, pointed out.

5. A railroad corporation giving a mortgage of its franchise, lands. and other property, to a trustee for the equal security, or payment, of all its unsecured creditors, does not thereby commit an act of bankruptcy within the 39th section of the bankrupt act [14 Stat. 536].

6. A common carrier is not a trader, and a mortgage by a railroad company is not an act of unusual character, i. e., out of the ordinary course of its business within the meaning of the bankrupt act.

7. One who is insolvent and undertakes to make a final distribution of his assets must do it through the bankrupt court. A trust to sell all a debtor's property and divide the cash ratably among his creditors, is an act of bankruptcy, but a mortgage by a railroad company to secure all its creditors equally out of its earnings, or to pay such as refuse the security their ratable proportion of the proceeds, is not an act of bankruptcy.

[Cited in Globe Ins. Co. v. Cleveland Ins. Co., Case No. 5,486.]

[Cited in Steel Edge Stamping & R. Co. v. Manchester Sav. Bank (Mass.) 39 N. E. 1022.]

---

[1] [Reprinted from 10 N. B. R. 178. by permission. 8 Am. Law Rev. 779, contains only a partial report.]

The petitioner alleged that he was a creditor of the Union Pacific Railroad Company, a corporation created by an act of congress, and having its domicile and usual place of business at Boston, in this district; that the petitioner was the owner of eight bonds of the company payable to bearer for one thousand dollars each, commonly known as income bonds, which were not secured by mortgage, and would be due on the 1st day of September next; that the defendant corporation was possessed of a railroad and of certain lands, easements, and other property, subject to certain mortgages, and being so possessed and being insolvent did, on the eighteenth day of December last, make a transfer and assignment of said railroad and other property to the Union Trust Company of New York, to secure sixteen millions of bonds which purported to be issued in discharge of and exchange for its antecedent liabilities, including said income bonds. A statement of the debts of the company, and the amount of annual interest thereon and of the earnings, was given in the petition to prove the insolvency of the defendants. The mortgage was averred to have been given with intent to delay, defraud, and hinder creditors, including the petitioner and to give a preference to some creditors over others, and to defeat the operation of the bankrupt act. A copy of the mortgage was annexed to one of the affidavits, and purported to transfer all the property of the company subject to existing mortgages for the payment or security of all the unsecured debts of the company, including the ten millions of income bonds. The conveyance was made with the usual defeasance of a mortgage and conditioned for the payment of the bonds to be issued under it, with semi-annual interest, and with a provision for a sinking fund, and in trust for the uses and purposes, and upon the terms, conditions, and agreements, therein set forth. One of the agreements was as follows: "And it is further covenanted and agreed that eleven millions one hundred and eleven thousand one hundred and eleven dollars of the bonds hereby intended to be secured, shall be reserved to be used at the times and in the manner determined by the vote of the directors of the company, in exchange for or the proceeds thereof to be used for the purchase or payment of the bonds known as the ten per cent. income bonds, by the party of the first part; and the said bonds so reserved as aforesaid, or the proceeds thereof, or any part thereof, shall not, at any time or under any circumstances, be applied or appropriated to any other purpose than that hereinbefore declared, until the same shall have been fully redeemed or paid." There was annexed to the same affidavit a copy of a circular issued by the defendant company to the holders of the income bonds, in which an offer was made to exchange said bonds for the new bonds, on certain terms, giving

six new bonds for five old bonds to make up the difference in interest, the new bonds carrying a less rate of interest than the old, and this circular announced that the directors had already availed themselves of this offer to the extent of nearly three millions of bonds owned by them. A part of section 3 of the act of congress, approved March 3, 1873, c. 226, was cited, in these words: "The books, records, and correspondence, and all other documents of the Union Pacific Railroad Company, shall at all times be open to the inspection of the secretary of the treasury, or such persons as he may designate for that purpose. The laws of the United States providing for proceedings in bankruptcy shall not be held to apply to said corporation. No dividend shall hereafter be made by said company but from the actual net earnings thereof, and no new stock shall be issued or mortgages or pledges made on the property or future earnings of the company without leave of congress, except for the purpose of funding and securing the debt now existing or the renewals thereof." By consent of parties counsel were heard upon the question whether an order to show cause should issue, a question which is usually decided ex parte.

W. D. Shipman and E. L. Andrews, for petitioners.

S. Bartlett and B. R. Curtis, for defendants.

LOWELL, District Judge. Two most important and interesting questions have been argued in this case. 1st. Whether the petition alleges an act of bankruptcy on the part of the defendant corporation? 2d. Whether the statute which exempts the defendant from the operation of the bankrupt act, is within the constitutional power of congress to enact?

It is admitted to be the better opinion generally, and the settled law of this circuit, that a railroad corporation is liable to be made bankrupt; and within a month last past I have adjudged one to be so for preferences such as would have sufficed in the case of a natural person. So that, as I said before, the first question is whether, in making a mortgage of its franchise, lands, and other property to a trustee, for the equal security or payment of all its unsecured creditors, this company has committed a technical fraud within the 39th section of the bankrupt act. A class of decisions has been referred to in argument as having a close resemblance to this case, in which it was held that a conveyance of all the property of a trader in trust to sell it and distribute the money to creditors proportionately, precisely as it must be divided in bankruptcy, is a technical fraud on the statute. The ablest writer upon the subject has expressed his surprise that this doctrine should ever have been adopted. "It is, however, difficult to understand," said Lord Henley, "how an as-

signment of the whole of a trader's property, though the direct and immediate object of it be for the payment and benefit of all creditors, should have been deemed an act of bankruptcy, as done with an intent to defraud and delay creditors. This doctrine has occasionally met with his disapprobation, and the reasons upon which it is founded are by no means satisfactory." Henley (Eden) Bankr. Law, 28. He admits that at the time he wrote (1832) the authorities were unanimous against his opinion, and there has been no change in the law since that time. I consider the better opinion under our bankrupt act to be the same, that it forbids such a distribution by means of a private trust created by the debtor, unless all his creditors consent.

Various reasons are given, the substance of which is, that if an estate is to be wound up by trustees, they should be appointed by, and be subject to, the order of the courts having jurisdiction of the subject-matter; and that the creditors should have a voice in their appointment. Putting a person into bankruptcy who has undertaken to have his affairs wound up in this way, is scarcely more than a specific performance of the trusts he has himself created. The decisions under the bankrupt act have not been uniform, but the prevailing doctrine agrees with the law of England. But this case does not come precisely within that range of decisions, because we have not here a person admitting that his business must be wound up and his property be sold and divided, but one who undertakes to keep on, in his ordinary and proper business, and divide his earnings equally among all his creditors, with a security upon the principal for the fulfillment of that undertaking. If the defendant were a trader, I should not doubt that a mortgage by which he secured his creditors the payment after a lapse of twenty years' time, of their debts now or soon coming due, would be an act of bankruptcy as delaying them under the guise of security. Stewart v. Moody, 1 Cromp. M. & R. 777; In re Chamberlain [Case No. 2,574]. But a carrier is not a trader, and this mortgage is not a mere trust to pay in twenty years. The undertaking of a trader who trades on credit undoubtedly is to sell his goods in season to meet the payments for their purchase, and if, instead of doing so, he makes a trust for their payment at a later time, he has broken his engagement. It can hardly be said that a railroad company contracting a debt for building and equipping its road, undertakes to sell its franchise in season to pay that debt as it matures. Wisely or unwisely, it has been the policy of this country to encourage the building of these new highways by borrowed capital, and it is, I fear, true of a very large proportion of these corporations that that they neither can nor are expected to

pay such debts at maturity, excepting by negotiating a new mortgage; and if the very act of giving such a mortgage is a technical fraud on the statute, then all these companies are, or at a period already fixed will certainly be, bankrupt. It was hardly a part of the understanding between this defendant and the purchasers of the income bonds that it must either pay them at maturity or sell out its road and relinquish its enterprise, while a trader does, I apprehend, assume that very burden. It has often been decided by juries, and even by courts, as matter of law, that a mortgage of a trader's whole stock in trade is a transaction out of the ordinary course of his business. But it has never been said, and cannot with truth be said, that a mortgage by a railroad company is an act of an unusual character. It would be out of the ordinary course of its business as a carrier of passengers and goods, but it must be admitted that as a mode of raising or renewing a part of its capital, it is of only too frequent occurrence, and is encouraged by legislation and the announced policy of the country. It is implied in the statute cited in this case, that this defendant may secure its outstanding debts in this mode. Another difference between a mortgage of this kind and one in which an ordinary trader should postpone the payment of his debts, is this: The note or bond of a railroad company secured by mortgage, is a well known security which passes current in the market, and the full value of which or what the general opinion fixes as its value can always be obtained. Its creditors who are unsecured are offered a new bond which is secured, they are obtaining a security which is at least as valuable as what they already have; in other words they are not delayed, according to any ordinary view of the matter that would be likely to occur to a person dealing in such securities. This petitioner is not injured by being offered a security fully as valuable and as readily convertible into money as that which he already has, and if the law departs in this respect from the fact, it in so far contravenes the truth, which is not to be presumed.

Another important point is that this mortgage does not merely offer to postpone the debt, but to give the long bond or the money instead thereof. This is plainly one of the trusts, and the trustee can be compelled to apply the new bonds in one or the other of these modes, to the satisfaction of the present creditors. The argument that this is not the purport of the mortgage seems to me wholly unfounded. If the bonds were at par, it is plain that no possible injury could be done to any creditor, because he might take the money if he did not like the bond. The plaintiff argues that he is entitled to prove that these bonds are not at par, and that they will probably not be so in Septem-

ber next, when his debt will mature, and if not then he must be content with something less than his debt, to wit, an equal dividend with the other creditors, of what the bonds will produce, and that, he says, is bankruptcy. I think there is some evidence in the mortgage itself that the defendant is not now and will not be likely soon to be in a position to pay these petitioners and its other unsecured creditors in full; and then the question is whether it is an act of bankruptcy in an insolvent railroad company, or one likely to become so, to make a mortgage to raise money for the equal benefit of its creditors. It is often said that an insolvent person has but two lawful courses open to him —to compromise with his creditors with the assent of every one of them, or to go into bankruptcy. But this is too broad a statement. We are admonished by a late decision of the supreme court that there is at least one other, namely, to remain entirely passive and permit his creditors to make what they can out of his property by legal process independent of bankruptcy. Wilson v. City Bank of St. Paul [17 Wall. (84 U. S.) 473]. And this is what the plaintiff says that defendant should do. The true explanation of Wilson v. City Bank of St. Paul, ubi supra, is that an insolvent trader may intend, and expect, and hope to recover his position and continue his trade, and therefore his failing to go into bankruptcy when his property is attached, does not lead to the inference that he intends to prefer the attaching creditor. Indeed, the decision arrived at rests upon the proposition that an insolvent person is under no legal obligation to go into bankruptcy under any circumstances. I must not be understood as criticising in a hostile sense a decision of the supreme court, which I believe to be a perfectly sound interpretation of the existing bankrupt law. I am merely pointing out its true scope. The only general proposition that can safely be laid down is one which I mentioned before, that one who is not only insolvent but who undertakes to make a final distribution of his assets, must do it through the bankrupt court.

If then the defendants, though technically insolvent, are not bound to go into bankruptcy, and do not undertake to make a distribution of their assets, are they bound to wait until these millions of income bonds mature, and then submit themselves to such processes of attachment and others as the laws may give to those of their creditors who choose to avail themselves of these remedies? Or can they mortgage their property in good faith to raise the money necessary to pay more debts, or so much of them pro rata as their property will bring in the market? So far as I know it has always been held that even a trader may mortgage his property for present value if there be no actual fraud. At common law a mortgage of goods necessarily delays creditors, because the goods cannot be taken in execution while the mortgage remains unpaid; and yet it is the law that a mortgage given for the honest purpose of relief, however inadequate the relief may be, that is to say, though the whole stock be mortgaged for a small advance, and however certain it may be that creditors will be delayed in levying their executions, will not be considered to be given with intent to delay them, the intent being really wanting. "It has been held," said Cockburn, C. J., delivering the opinion of the court of exchequer chamber, "that when a trader assigns his whole property, but receives in return a fair equivalent, the transaction is not void under the bankrupt law." Mercer v. Peterson. L. R. 3 Exch. 106, affirming the decision of the exchequer. In that case the whole was assigned for a return of about one-half. And it is obvious from the remarks of the judges that such an incumbrance would tend to delay half the creditors, but it was supported as being done in good faith and for present value with intent to continue the trade. See Robs. Bankr. American cases to the same effect are Darby v. Boatman's Sav. Inst. [Case No. 3,571]; Darby v. Lucas [Id. 3,573], affirmed; Tiffany v. Lucas [15 Wall. (82 U. S.) 410]. I understand the argument of the plaintiff to admit the soundness of these decisions, and to concede that a mortgage for money is always valid unless there were some intent to use the money fraudulently, and he does not contend that any such intent is proved or alleged in this case, but he does insist that he does not wish to take the bonds, and that those who do consent to take them will immediately become preferred creditors. This argument was repeated in various forms and dwelt upon with much earnestness, but I cannot admit its force. It is a new idea of preference that a security can be a fraudulent preference to some creditors which is offered equally to all. The very fundamental conception of preference is inequality, and this is equality. The creditors might perhaps have some reason to complain if the option were not given them, but that they can have any ground to object to the alternative can never be granted. It may be said that such a mortgage differs only in form from a sale of the whole property, with the intent to divide the proceeds among the creditors, instead of applying to the bankrupt court for that purpose. The difference is not great, but there is the point of distinction already mentioned, that the sale of a railroad would be a confession of the necessity of breaking up the business, while a mortgage does not carry with it that admission. Besides, although, as we have seen, a trust for sale and distribution by a sort of private bankruptcy, has been held by a preponderance of authority to be illegal, an outright sale for cash has never been so regarded, even in the case of a trader, unless he intended to commit some actual fraud or some fraud on the bankrupt act, with the proceeds.

A sale is mentioned in the statutes as one made in which fraud may be committed, and sales as well as mortgages have been set aside. See Walbrun v. Babbitt [16 Wall. (83 U. S.) 577]. I have set aside several sales and mortgages. But sales and mortgages for cash paid down have been uniformly upheld, in the absence of an actual intent to commit a fraud or preference with the money so obtained; and there is no case in which the intent to keep the money in full reach of creditors, instead of the property, or even to divide it ratably among them, has been held to be such a fraud. There is one case in Massachusetts, in which it was decided that when an insolvent person converted his assets into money, and offered to pay all his creditors pro rata, he had committed a fraud upon the act as against a creditor who had refused to receive his share. Fernald v. Gay, 12 Cush. 596. But that case was decided under St. 1844, c. 178 § 8, which provided that no discharge should be granted "if the debtor hereafter, when insolvent, shall within one year next before the filing of the petition by or against him, pay or secure, either directly or indirectly, in whole or in part, any borrowed money, or pre-existing debt," and of course the case came within the very words of that statute. It was not a decision upon the subject of preferences generally, nor is that word mentioned in the section, nor is there such a word as "intent" in that law. In my judgment it would not be a preference, under the bankrupt act, to pay several creditors sums which the debtor was able and willing to pay to all; though I do not mean to say that he must not be always ready (tout temps prest) to pay to all their equal share. While, therefore, I find it to be settled by a preponderance of authority, though against some weighty opinions, that a trust to sell all a debtor's property and divide the cash ratably among his creditors is an act of bankruptcy. I do not find it to be settled that a sale by the debtor himself for cash with intent so to divide it, is such an act, much less that a mortgage by a railroad company to secure all its creditors equally out of its earnings, or to pay such as refuse the security their ratable proportion of the proceeds, is an act of bankruptcy.

My opinion upon the first question renders it unnecessary that I should decide the still more interesting one of the constitutionality of the statute which undertakes to except this corporation out of the general law. If supported, it must be, I think, upon the ground of a right in congress to modify the charter of the company to that extent. Order to show cause refused.